Filed 8/23/22 Dias & Fragoso v. Dept. of the Cal. Highway Patrol CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| DIAS & FRAGOSO, INC., et al.,<br><br>Plaintiffs and Respondents,<br><br>v.<br><br>DEPARTMENT OF THE CALIFORNIA HIGHWAY PATROL,<br><br>Defendant and Appellant. | F082219<br><br>(Super. Ct. No. 20C-0117)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kings County. Kathy Ciuffini, Judge.

Rob Bonta, Attorney General, Matthew Rodriquez, Acting Attorney General, Thomas S. Patterson, Assistant Attorney General, Heather Hoesterey and Jose A. Zelidon-Zepeda, Deputy Attorneys General, for Defendant and Appellant.

Sagaser, Watkins & Wieland, Howard A. Sagaser and Lisa M. Horton for Plaintiffs and Respondents.

-ooOoo-

**SEE CONCURRING AND DISSENTING OPINION**

Commercial drivers generally are subject to various federal and state hours-of-service and on-duty time limitations. Vehicle Code section 34501.2, subdivision (c)[1] (section 34501.2(c) or § 34501.2(c)) provides certain hours-of-service exceptions for drivers engaged in intrastate transport of farm products from the field to the first point of processing or packing. (§ 34501.2(c)(1).) The statute specifically defines "[f]irst point of processing or packing" as "a location where farm products are dried, canned, extracted, fermented, distilled, frozen, ginned, eviscerated, pasteurized, packed, packaged, bottled, conditioned, or otherwise manufactured, processed, or preserved for distribution in wholesale or retail markets." (§ 34501.2(c)(3)(B).)

In this case, plaintiffs Dias & Fragoso, Inc., and Danell Custom Harvesting, Inc. (collectively, plaintiffs), sued the Department of the California Highway Patrol (CHP) seeking a declaration their transportation of chopped cornstalks to a location for fermentation fits the definition of first point of processing under section 34501.2(c)(3)(B) and thus qualifies for an agricultural hours-of-service exception under section 34501.2(c)(1). The trial court construed section 34501.2(c)(3)(B) in favor of plaintiffs and granted their motion for summary judgment, which the CHP now appeals.

The CHP contends the trial court erred in granting summary judgment because declaratory relief is not available in the context of the case. The CHP further argues the hours-of-service exception for transporting farm products does not apply to plaintiffs' operations because: (1) the chopping and mulching of cornstalks in the field to create the silage is the first point of processing; and (2) the phrase "for distribution in wholesale or retail markets" unambiguously modifies all prior processing descriptions such that only farm products processed for distribution in wholesale or retail markets fit the definition. Finding no merit to the CHP's arguments, we affirm.

---

[1]     All further statutory references are to the Vehicle Code unless indicated otherwise.

2

## LEGISLATIVE BACKGROUND OF SECTION 34501.2

When section 34501.2 was enacted in 1984, federal regulations principally prohibited interstate commercial drivers from driving more than 10 hours or for any period after having been on duty for 15 hours. (49 C.F.R. former § 395.3 (1980), 45 Fed. Reg. 46425 (July 10, 1980).) Section 34501.2 set limits generally consistent with federal hours-of-service requirements, but it carved out an express exception for vehicles engaged solely in intrastate commerce that were not transporting hazardous substances or wastes, which were limited to 12 hours maximum driving time within a work period. (§ 34501.2, former subd. (b)(4); Stats. 1984, ch. 779, § 4, p. 2772.)

In 1992, section 34501.2 was amended to align hours-of-service limitations on commercial vehicles engaged in intrastate commerce with federal regulations applicable to drivers engaged in interstate commerce transport. In enacting the amendments, the Legislature intended to "address the alarming increase in commercial truck accidents in California caused by driver fatigue due to excessive hours of service" by regulating "the hours of service of drivers of commercial vehicles engaged in intrastate commerce in a manner equivalent to federal regulations applicable to interstate commerce, with a minimum of exceptions." (Stats. 1992, ch. 1144, § 1(b), pp. 5308–5309.)

Among the limited exceptions for vehicles engaged in intrastate commerce, former section 34501.2(c)(1) provided two exceptions for vehicles transporting farm products:

> "(c)   The regulations adopted under Section 34501[2] for vehicles engaged in the transportation of farm products in intrastate commerce shall include all of the following provisions:
>
> > "(1)   A driver employed by an agricultural carrier …, including a carrier holding a seasonal permit …, or by a private carrier …, when

---

**2**     Section 34501 directs the CHP to adopt rules and regulations to promote the safe operation of vehicles described in section 34500, which includes commercial motor vehicles. (§§ 34501, subd. (a)(1), 34500, subd. (k).)

transporting farm products from the field to the first point of processing or packing, shall not drive for any period after having been on duty 16 hours or more following eight consecutive hours off duty and shall not drive for any period after having been on duty for 112 hours in any consecutive eight-day period, except that a driver transporting special situation farm products from the field to the first point of processing or packing, or transporting livestock from pasture to pasture, may be permitted, during one period of not more than 28 consecutive days or a combination of two periods totaling not more than 28 days in a calendar year, to drive for not more than 12 hours during any workday of not more than 16 hours. A driver who thereby exceeds the driving time limits specified in paragraph (2) of subdivision (b) shall maintain a driver's record of duty status, and shall keep a duplicate copy in his or her possession when driving a vehicle subject to this chapter. These records shall be presented immediately upon request by any authorized employee of the department, or any police officer or deputy sheriff. [¶] … [¶]

"(3)    For purposes of this subdivision, the following terms have the following meanings:

"(A)    'Farm products' means every agricultural, horticultural, viticultural, or vegetable product of the soil, honey and beeswax, oilseeds, poultry, livestock, milk, or timber.

"(B)    'First point of processing or packing' means a location where farm products are dried, canned, extracted, fermented, distilled, frozen, ginned, eviscerated, pasteurized, packed, packaged, bottled, conditioned, or otherwise manufactured, processed, or preserved for distribution in wholesale or retail markets.

"(C)    'Special situation farm products' means fruit, tomatoes, sugar beets, grains, wine grapes, grape concentrate, cotton, or nuts."

As required by the statute, CHP's Commissioner codified a regulation that rearticulated the statutory exception for intrastate transport of farm products. California Code of Regulations, title 13, section 1212, subdivision (k) (Regulations section 1212(k) or Regs. § 1212(k)) currently provides as follows:

4

"(k)   Farm products.

"(1)   A driver when transporting farm products from the field to the first point of processing or packing, shall not drive;

"(A)   More than 12 hours following eight-consecutive hours off duty.

"(B)   For any period after having been on duty 16 hours or more following eight consecutive hours off duty.

"(C)   For any period after having been on duty for 112 hours in any consecutive eight-day period.

"(2)   A driver transporting special situation farm products from the field to the first point of processing or packing, or transporting livestock from pasture to pasture, may be exempted from the eight-day cumulative limit, specified in Sections 1212(k)(1)(C) and 1212.5(a)(4), during one period of not more than 28 consecutive days or a combination of two periods totaling not more than 28 days in a calendar year.  [¶] … [¶]

"(5)   For purposes of this section, the following terms have the following meanings:

"(A)   'Farm Products' means every agricultural, horticultural, viticultural, or vegetable product of the soil, honey and beeswax, oilseeds, poultry, livestock, milk, or timber.

"(B)   'First point of processing or packing' means a location where farm products are dried, canned, extracted, fermented, distilled, frozen, ginned, eviscerated, pasteurized, packed, packaged, bottled, conditioned, or otherwise manufactured, processed, or preserved for distribution in wholesale or resale markets.

"(C)   'Special situation farm products' means fruit, tomatoes, sugar beets, grains, wine grapes, grape concentrate, cotton, or nuts."
(Regs. § 1212(k)(1)(A)-(C),  (k)(2),  (k)(5)(A)-(C).)

Other statutory provisions render motor carriers subject to misdemeanor citations and fines if they schedule, require, or permit the operation of any motor vehicle in a manner that exceeds the maximum hours of service.  (§§ 34501.3, subd. (a)(2) & (c), 40000.21, subd. (g).)

5

## FACTUAL AND PROCEDURAL BACKGROUND

The facts are undisputed. Plaintiffs are custom harvesters of corn silage and similar feeds for dairies located in and around Kings County. The dairies grow the cornstalks and plaintiffs use specialized harvest equipment to cut them in the field while they are still green, which is often referred to as "greenchopping." Plaintiffs then transport the harvested stalks to the dairies where the cornstalks are packed and covered so they can be fermented. Once the cornstalks are transformed into silage through the anaerobic bacterial fermentation process, the dairies use the silage for livestock feed; generally, the cornstalks are not used for feed until the fermentation process is completed. There is only a short window of time for the cornstalks to be harvested and transported or they will rot in the field.

In February 2020, after a CHP officer auditing an agricultural client of plaintiffs' counsel told the client the cutting and transportation of cornstalks to dairies to ferment into silage would not qualify for the section 34501.2(c) hours-of-service exception for transportation of farm products, plaintiffs' counsel sought an opinion letter from the CHP's Enforcement and Planning Division whether plaintiffs' operations would qualify for the exception.

The CHP's Commercial Vehicle Section (CVS) responded with an opinion letter the following month. Relying on a November 1994 CHP Information Bulletin (Bulletin) that interpreted section 34501.2 and corresponding Regulations section 1212(k), the CVS opined the exception for farm product transportation did not apply to plaintiffs' operations for two reasons: (1) the first point of processing occurs in the field where the cornstalks are chopped and mulched, not where the cornstalks are fermented; and (2) the silage is not produced for distribution in wholesale or retail markets, but rather is consumed on the farm where it is produced.

6

Plaintiffs subsequently filed this action against the CHP seeking declaratory relief under Code of Civil Procedure section 1060. Plaintiffs alleged an actual controversy existed between themselves and the CHP over whether plaintiffs' custom harvesting activities qualify for section 34501.2(c)'s agricultural exception. Plaintiffs sought a judicial determination setting forth the parties' right and obligations with respect to the exception and asked the court to declare that plaintiffs' harvesting activities qualify for the exception.

The CHP filed a motion for judgment on the pleadings, which the trial court denied.[3] The trial court found, contrary to the CHP's position, case law has approved declaratory relief actions when quasi-legislative administration is at issue and no pending administrative proceeding exists. The trial court concluded the complaint stated a cause of action for declaratory relief, and the CHP's motion was not an appropriate method to test the merits of the action.

Plaintiffs moved for summary judgment. For the purposes of that motion, the CHP did not dispute any of plaintiffs' statements of material fact. Following a hearing, the trial court granted summary judgment in plaintiffs' favor. The trial court rejected the CHP's argument the dispute could be brought only through a petition for writ of mandate, since no administrative remedy existed to resolve the dispute.

On the merits, the trial court agreed with the CHP that " 'distribution in wholesale or retail markets' language appears to qualify all 'first point of processing' descriptions in the 1994 Bulletin, but the Vehicle Code added the disjunctive 'or' to the statute. The whole purpose of the exemption, to assist in allowing crops to be harvested and transported for processing during a short harvest season before rotting in the field, supports plaintiff's interpretation of the statute." The trial court concluded the statute

---

**3** None of the papers offered in support of or in opposition to the motion are in the appellate record; only the trial court's order is included.

7

was unambiguous: it exempts drivers of special situation farm products from the field to the first point of processing; and "[t]he statute does not list cutting or harvesting under its definition of first point of processing." The court reasoned that because CHP's interpretation "inserts actions that the [L]egislature did not include in the definition of a 'first point of processing,' " its "interpretation is necessarily arbitrary, capricious, and without rational basis."

CHP appealed.[4]

## **DISCUSSION**

### I. Declarative Relief is Appropriate

The CHP argues the trial court erred as a matter of law because a declaratory relief action is unavailable to review an administrative decision. Relying on *State of California v. Superior Court* (1974) 12 Cal.3d 237, 249 (*State of California*), the CHP argues relief is available against an agency only through a petition for a writ of traditional or administrative mandamus. (Code Civ. Proc., §§ 1085, 1094.5.) The CHP avers that in the context of an agency determination, declaratory relief is proper only to declare a statute facially unconstitutional.

" 'The proper method of obtaining judicial review of most public agency decisions is by instituting a proceeding for a writ of mandate.' " (*Nathan G. v. Clovis Unified School Dist.* (2014) 224 Cal.App.4th 1393, 1399, fn. omitted.)[5] "Two such writs are

---

**4** Although the trial court did not enter a "judgment," its written order dated November 3, 2020, left nothing to be resolved between the parties and we construe it to be a final judgment from which CHP may appeal. (*Agosto v. Board of Trustees of Grossmont-Cuyamaca Community College Dist.* (2010) 189 Cal.App.4th 330, 335, fn. 3; *Townsel v. San Diego Metropolitan Transit Development Bd.* (1998) 65 Cal.App.4th 940, 944, fn. 1.)

**5** The writ of mandamus may be denominated a writ of mandate. (Code Civ. Proc., § 1084.)

8

provided by statute: (1) ordinary mandamus ([Code Civ. Proc.,] § 1085) and (2) administrative mandamus ([Code Civ. Proc.,] § 1094.5)." (*Id*. at p. 1400.)

Typically, "[t]he applicable type of mandate is determined by the nature of the administrative action or decision. [Citation.] Usually, quasi-legislative acts are reviewed by ordinary mandate and quasi-judicial acts are reviewed by administrative mandate. [Citation.] [¶] 'Generally speaking a legislative action is the formulation of a rule to be applied to all future cases, while an adjudicatory act involves the actual application of such a rule to a specific set of existing facts.' " (*McGill v. Regents of University of California* (1996) 44 Cal.App.4th 1776, 1785.)

As recognized in *State of California*, *supra*, 12 Cal.3d at page 249 and *Tejon Real Estate, LLC v. City of Los Angeles* (2014) 223 Cal.App.4th 149, 154–155 (*Tejon*), it is settled that agency decisions are not reviewable through a declaratory relief action under Code of Civil Procedure section 1060.[6] These cases involved discretionary, quasi-judicial agency decisions reviewable only in administrative mandamus proceedings under

---

[6] In recognizing this settled proposition, *State of California* relied on a line of authority dating back to 1952. (*State of California*, *supra*, 12 Cal.3d at p. 249, citing *Selby Realty Co. v. City of San Buenaventura* (1973) 10 Cal.3d 110, 127 (*Selby*); *Hostetter v. Alderson* (1952) 38 Cal.2d 499, 500 (*Hostetter*); *Escrow Owners Assn. Inc. v. Taft Allen, Inc.* (1967) 252 Cal.App.2d 506, 510 (*Escrow Owners*); *Floresta, Inc. v. City Council* (1961) 190 Cal.App.2d 599, 612 (*Floresta*).) Without exception, these courts commented on the unavailability of declaratory relief with respect to review of quasi-judicial administrative decisions. (See *Selby*, at p. 127 [declaratory relief not available to review agency's building permit denial]; *Hostetter*, at p. 500 [agency decision to remove fireman from his position after hearing process could not be reviewed through action for declaratory relief]; *Escrow Owners*, at p. 510 [agency commissioner's licensing decisions were foundational to the action and were not subject to attack through a declaratory relief action]; *Floresta*, at p. 612 [denial of property use permit could not be challenged through declaratory relief action].) *Tejon* cited *State of California* and this line of authority in concluding a declaratory relief action could not be used to sidestep agency procedures and an adjudicatory decision on a building permit. (*Tejon*, *supra*, 223 Cal.App.4th at pp. 154–155.)

Code of Civil Procedure section 1094.5. On the other hand, as observed by our Supreme Court in *Pacific Legal Foundation v. California Coastal Com.* (1982) 33 Cal.3d 158, "[q]uasi-legislative [agency] acts are reviewable only by an action for declaratory relief (Code Civ. Proc., § 1060) or for traditional mandamus (*id.*, § 1085)." (*Id.* at pp. 168–169; see *Californians for Native Salmon etc. Assn. v. Department of Forestry* (1990) 221 Cal.App.3d 1419, 1429 ["quasi-legislative policy set by an administrative agency … is subject to review in an action for declaratory relief"].) Agency decisions that constitute neither quasi-legislative nor discretionary quasi-judicial acts reviewable under Code of Civil Procedure section 1094.5 may be reviewed in traditional mandamus proceedings. (See *Matteo v. Department of Motor Vehicles* (2012) 209 Cal.App.4th 624, 628, 630 (*Matteo*) [DMV's denial of IID-restricted license application consistent with DMV's statewide policy interpreting relevant statute reviewed through traditional mandamus proceedings].)

Yet, this authority, including that cited by the CHP, all relates to judicial review of some type of agency determination or action. Plaintiffs' declaratory relief suit does not seek review of any agency decision, determination, or action, or directly challenge the validity of the CHP Bulletin. Nothing in the record indicates the CHP has made a decision regarding plaintiffs' operations: the CHP has not cited plaintiffs for violating section 34501.2 or made a determination specific to plaintiffs' business operations. At most, the CHP has provided plaintiffs' counsel with an opinion letter in response to plaintiffs' counsel's request that never specifically identified plaintiffs, advising how it would apply its understanding of section 34501.2(c) based on the CHP Bulletin and the facts plaintiffs' counsel supplied.

Moreover, the CHP has not asserted an agency process exists whereby businesses or drivers may seek application of section 34501.2(c)'s intrastate farm products transportation exception, nor does it cite any available or mandatory agency

10

administrative processes related to section 34501.2(c).  Thus, plaintiffs are not attempting to use declaratory relief to skirt existing, mandatory administrative processes.  (See *Tejon*, *supra*, 223 Cal.App.4th at pp. 154–155 [explaining administrative permitting process was not optional and could not be sidestepped by a declaratory relief action]; see also *Public Employees' Retirement System v. Santa Clara Valley Transportation Authority* (2018) 23 Cal.App.5th 1040, 1046 [action for declaratory relief not available to review CalPERS executive policy to be applied in pending administrative cases in prescribed agency processes].)

Rather, based on a CHP officer orally advising an unnamed "agricultural client" that the client's operations did not fit the section 34501.2(c) exception, which was confirmed through the CHP's opinion letter, plaintiffs sought a declaration of their rights and duties under section 34501.2.  They sought this declaration before they were subjected to citations and fines for failure to adhere their business schedules to regular driver hours-of-service limits.

Code of Civil Procedure section 1060 authorizes actions for declaratory relief by any person interested under a "written instrument" or "contract" or "who desires a declaration of his or her rights or duties with respect to another, or in respect to, in, over or upon property … may, in cases of actual controversy relating to the legal rights and duties of the respective parties, bring an original action … in the superior court for a declaration of his or her rights ... including a determination of any question of construction or validity arising under the instrument or contract."  (Code Civ. Proc., § 1060.)  The purpose of declaratory relief is "to set controversies at rest before they lead to repudiation of obligations, invasion of rights or commission of wrongs."  (*Travers v. Louden* (1967) 254 Cal.App.2d 926, 931.)  It "is to be used in the interests of preventive justice, to declare rights rather than execute them."  (*Ibid*.)  In the posture presented here—where no agency decision has been made about plaintiffs' operations and there is

11

no applicable agency adjudicatory process—CHP has not established the unavailability of declaratory relief, and it appears particularly well-suited to these circumstances.[7]

## II.    The Interpretation of Section 34501.2(c)

With the singular express carve-out for transporting livestock from pasture to pasture, the hours-of-service exceptions for transportation of farm products in intrastate commerce depend on whether a driver is moving farm products "from the field to the first point of processing or packing," which is defined as "a location where farm products are dried, canned, extracted, fermented, distilled, frozen, ginned, eviscerated, pasteurized, packed, packaged, bottled, conditioned, or otherwise manufactured, processed, or preserved for distribution in wholesale or retail markets."[8]  (§ 34501.2(c)(1) &(3)(B); Regs. § 1212 (k)(2) & (5)(B).)

Determining whether plaintiffs' operations qualify for the exception raises two questions:  (1) whether the "first point of processing" occurs in the fields or at the dairies,

---

**7**      The CHP does not articulate any justiciability argument.  While the CHP cites *Zetterberg v. State Dept. of Public Health* (1974) 43 Cal.App.3d 657 (*Zetterberg*) for the proposition that a difference of opinion as to the interpretation of a statute between a citizen and a government does not give rise to a justiciable controversy, no argument is presented. In *Zetterberg*, the court held declaratory relief was "inappropriate" because the action sought general declarations related to the allocation of power among two agencies of the executive branch. (*Id.* at p. 661.)  The court explained "[a] citizen's mere dissatisfaction with the performance of either the legislative or executive branches, or disagreement with their policies does not constitute a justiciable controversy." (*Id.* at p. 662.)  The issue here involves more than a citizen voicing disagreement with how the CHP interprets section 34501.2(c).

**8**      There is a second hours-of-service exception for drivers transporting "special situation farm products" from field to "first point of processing or packing." (§ 34501.2(c)(1).)  While the basic exception limits drivers to 112 on-duty hours in an eight-day period, drivers transporting special situation farm products are exempted from the eight-day cumulative limit during one period of not more than 28 consecutive days or a combination of two periods totaling not more than 28 days in a calendar year. (*Ibid.*; Regs. § 1212(k)(2).)

since the exception does not apply if it occurs in the fields; and (2) whether the cornstalks must be processed "for distribution in wholesale or retail markets" because, if so, the exception does not apply. The CHP contends the exception does not cover plaintiffs' silage operations because: (1) the first point of processing occurs in the field, as that is where the cornstalks are chopped and mulched; and (2) the cornstalks are not processed for distribution in wholesale or retail markets. Plaintiffs argue the exception applies because: (1) the first point of processing occurs at the dairies, where the chopped cornstalks go through the fermentation process; and (2) there is no requirement that the resulting silage be distributed in wholesale or retail markets for the exception to apply.

## A.    *Standard of Review*

"On appeal after a motion for summary judgment has been granted, we review the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334.) As the facts related to plaintiffs' operations are undisputed, plaintiffs' declaratory relief action and the trial court's grant of summary judgment thereon present a question of statutory interpretation of section 34501.2(c)(3)(B). The interpretation of a statute in a declaratory relief action is a question of law that we review de novo. (*Harbor Fumigation, Inc. v. County of San Diego Air Pollution Control Dist.* (1996) 43 Cal.App.4th 854, 859.) We also independently review the application of the interpreted statute to the undisputed facts. (*Ibid.*)[9]

---

[9]    Plaintiffs assert the record on appeal is insufficient for us to conduct a meaningful review because it does not contain a transcript of the hearing on the CHP's motion for judgment on the pleadings or plaintiffs' motion for summary judgment, and it does not include a copy of the parties' briefs as to these motions. Since the issues presented are ones of statutory interpretation, which we review de novo, the determination of those issues are not shaped by the parties' briefs filed at the trial court or the arguments they

"As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose." (*People v. Murphy* (2001) 25 Cal.4th 136, 142.) "We begin as always with the statute's actual words, the 'most reliable indicator' of legislative intent, 'assigning them their usual and ordinary meanings, and construing them in context. If the words themselves are not ambiguous, we presume the Legislature meant what it said, and the statute's plain meaning governs. On the other hand, if the language allows more than one reasonable construction, we may look to such aids as the legislative history of the measure and maxims of statutory construction. In cases of uncertain meaning, we may also consider the consequences of a particular interpretation, including its impact on public policy.' " (*Even Zohar Construction & Remodeling, Inc. v. Bellaire Townhouses, LLC* (2015) 61 Cal.4th 830, 837–838 (*Even Zohar*).)

### B.    *Distribution of Farm Products*

We begin with the second issue, namely, whether the silage must be distributed in wholesale or retail markets for the exception to apply. As already stated, the statute defines the "[f]irst point of processing or packing" as "a location where farm products are dried, canned, extracted, fermented, distilled, frozen, ginned, eviscerated, pasteurized, packed, packaged, bottled, conditioned, or otherwise manufactured, processed, or preserved for distribution in wholesale or retail markets." (§ 34501.2(c)(3)(B); see Regs. § 1212(k)(5)(B).) The issue here is whether the term "distribution in wholesale or retail markets" modifies all the terms in the definition or only some of them.

---

made below, especially since there is no assertion that claims on appeal were forfeited for failure to raise them below. As for application of the statute to the facts, the record contains plaintiffs' statement of material facts and the CHP's statement disputing none of them. The record on appeal is sufficient to conduct review of the narrow issues presented.

We conclude the statutory definition is susceptible to at least three reasonable interpretations. (See *Mt. Hawley Ins. Co. v. Lopez* (2013) 215 Cal.App.4th 1385, 1398–1400 [statute ambiguous where it was susceptible to three reasonable interpretations regarding which terms a statutory phrase modified].)

One reasonable interpretation, advanced by the CHP, is that the phrase "for distribution in wholesale or retail markets" modifies all prior antecedent descriptive forms of processing preceding that phrase; therefore, any form of processing identified in the statute must be performed on farm products set "for distribution in wholesale or retail markets." (§ 34501.2(c)(3)(B).) Under this interpretation, the list of processing methods moves from the specific to the more general "otherwise manufactured, processed, or preserved" and the modifying phrase applies to both the specific and general descriptors. Since the cornstalks plaintiffs harvest are used by dairies who have grown them, the cornstalks are not processed for distribution in wholesale or retail markets and the section 34501.2(c) hours-of-service exception does not apply to the drivers transporting the cornstalks to the dairies.

A second reasonable interpretation, which plaintiffs assert the trial court correctly adopted, is that the phrase "for distribution in wholesale or retail markets" modifies only the general terms "or otherwise manufactured, processed, or preserved." (§ 34501.2(c)(3)(B).) As the words "manufactured, processed, or preserved" are punctuated by commas, they seem to be grouped together as a series which is set off from the more specific preceding methods listed. Reading the words in this manner and grouping the processing methods into two series, the first point of processing or packing means a location where farm products are (1) "dried, canned, extracted, fermented, distilled, frozen, ginned, eviscerated, pasteurized, packed, packaged, bottled, conditioned," or (2) "otherwise manufactured, processed or preserved for distribution in wholesale or retail markets." (*Ibid.*) Under this interpretation, since fermentation is

included in the first list of descriptors, the exception applies to plaintiffs' drivers even though the cornstalks are not fermented for distribution in wholesale or retail markets.

Finally, a third interpretation, which plaintiffs appear to also advocate for, is that the statute's multiple use of the disjunctive "or" means only the final descriptor "preserved" is modified by the phrase "for distribution in wholesale and retail markets." (§ 34501.2(c)(3)(B).) Under this interpretation, the first point of processing or packing means a location where farm products are (1) "dried, canned, extracted, fermented, distilled, frozen, ginned, eviscerated, pasteurized, packed, packaged, bottled, conditioned," *or* (2) "otherwise manufactured, processed," *or* (3) "preserved for distribution in wholesale or retail markets." (*Ibid.*) Like the second interpretation, *fermented* is an antecedent descriptor that is not modified by the phrase "for distribution in wholesale or retail markets" (*ibid.*); therefore, the exception applies even though the cornstalks are not fermented for distribution in the wholesale or retail markets.

Considering the definition of first point of processing in the broader context of the whole statute, there is nothing that conclusively resolves this interpretive issue. As the plain language of the definition is susceptible to more than one reasonable interpretation, we turn to secondary tools of statutory construction to determine which interpretation is most reasonable. (*People v. Raybon* (2021) 11 Cal.5th 1056, 1066 [ambiguity requires court to discern which of the parties' interpretations is most reasonable].)

### 1. Legislative History

Legislative history is one extrinsic aid to interpretation of a statute that is susceptible to more than one reasonable interpretation. (*Nolan v. City of Anaheim* (2004) 33 Cal.4th 335, 340; *Mejia v. Reed* (2003) 31 Cal.4th 657, 663.) Section 34501.2 was amended in 1992 by Assembly Bill No. 2417 (Assembly Bill 2417 or Assem. Bill 2417). According to the Legislature's express findings and the Legislative Counsel's Digest summarizing Assembly Bill 2417, the amendments were meant to address the "increase

16

in commercial truck accidents in California caused by driver fatigue due to excessive hours of service" and "regulate the hours of service of drivers of commercial vehicles engaged in intrastate commerce in a manner equivalent to federal regulations applicable to interstate commerce, with a minimum of exceptions." (Stats. 1992, ch. 1144, § 1, pp. 5308–5309; see Legis. Counsel's Dig., Assem. Bill No. 2417 (1991-1992 Reg. Sess.) Stats. 1992 Summary Dig., § 1, p. 494.)

After Assembly Bill 2417 was first introduced without a farm products transportation exception, various agricultural groups opposed the bill because it did not provide longer intrastate driving times for agriculture, which sometimes operates intensively during harvest season. (Assem. Com. on Transportation, Rep. on Assem. Bill 2417, as amended Mar. 11, 1992, pp. 2–3 [explaining opposition to bill and listing opponents as the Agricultural Council of California, California Farm Bureau Federation, California Forestry Association, California League of Food Processors, California Trucking Association, and Western Growers Association].) The core objections were that without an exception for transportation of farm products during harvest season, there would not be enough drivers available to transport agricultural products from the fields to processing locations within the relatively short harvest periods, which risked the quality of the products and would drive up costs.[10]

The bill's author thereafter announced she reached an agreement with the agricultural community to create a special rule permitting longer hours of service during the harvest season for drivers hauling agricultural commodities from the field to the first

---

[10]  See, e.g., Don Gordon, Agricultural Council of California, letter to Assembly Committee on Transportation, March 18, 1992; Bill Grigg, California League of Food Processors, letter to Assemblyman Richard Katz, March 18, 1992; Kathleen R. Mannion, Western Growers Association, letter to Assemblyman Richard Katz, March 19, 1992; Mary-Ann Warmerdam, California Farm Bureau Federation, letter to Assemblyman Richard Katz, March 20, 1992.

point of processing. (Statement of Assemblywoman Gwen Moore on Assem. Bill 2417, Assem. Com. on Transportation, Mar. 30, 1992.) A subsequent bill analysis by the Assembly Committee on Transportation explained the bill now provided special rules for drivers of vehicles transporting farm products from the field to first point of processing and the analysis no longer listed the agricultural groups as bill opponents. (Assem. Com. on Transportation, Analysis of Assem. Bill 2417, as amended Apr. 21, 1992, p. 3.)[11]

The legislative history supports the trial court's finding that the purpose of the exception is "to assist in allowing crops to be harvested and transported for processing during a short harvest season before rotting in the field." Nothing in the legislative history, however, sheds light on whether the Legislature intended the exception to relate only to farm products destined for distribution in wholesale or retail markets. Accordingly, the history is of little assistance in the interpretive process we are engaged in here, which requires us to turn to other interpretative tools.

### 2. Agency Interpretation: CHP Bulletin

The Legislature granted the CHP's Commissioner authority to enforce the Vehicle Code and adopt regulations. (§§ 2400, subd. (a), 2402.) Section 34501 directs the CHP to adopt rules and regulations to promote the safe operation of vehicles described in section 34500, which includes commercial motor vehicles. (§§ 34501, subd. (a)(1), 34500, subd. (k).) Section 34501.2(c) directs "[t]he regulations adopted under Section 34501 for vehicles engaged in the transportation of farm products in intrastate commerce shall include" all the provisions of section 34501.2(c)(1)-(3). As required by the statute, Regulations section 1212(k) incorporates section 34501.2(c)'s farm product

---

[11] On our own motion, we take judicial notice of the legislative materials cited herein. (*Noble v. Superior Court* (2021) 71 Cal.App.5th 567, 580, fn. 12; *Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 31–37.)

transportation provisions verbatim, including the definition of first point of processing or packing. (§ 34501.2(c)(3)(B); Regs. § 1212(k)(5)(B).) The regulation does not interpret the definition of " '[f]irst point of processing or packing' " or expand on it in any way. (Regs. § 1212(k)(5)(B).)

The CHP issued the Bulletin in November 1994 to clarify the hours of service and record of duty status requirements for drivers transporting farm products within the exceptions provided in Regulations section 1212(k), as it had fielded several questions regarding the section's interpretation since it commenced enforcement of the new hours-of-service regulations. The Bulletin states the "legislative intent" of the exception "is to allow additional on-duty hours for intrastate drivers employed or contracted by agricultural carriers, for the transportation of farm products from the field to the first point of processing or packing." The Bulletin provides to qualify for the exception, "the farm products must be: in virtually the same condition as when [] they were picked, cut, or uprooted in the field; in transit to a location where one or more of the actions listed within the definition of 'first point of processing or packing' in [Regs.] Section 1212(k)(3)(B) takes place (e.g., processed, manufactured, conditioned, etc….) for distribution in wholesale or resale markets."

The Bulletin explains that consistent with the legislative intent, the term "field" includes any "location where the product is taken but is not processed or packaged for final distribution in wholesale or resale markets." The Bulletin further explains: " 'First point of processing or packing' does not include any incidental handling of a product such as cleaning, spraying (for bugs, etc.), inspecting and/or separating, temporarily storing (cold or otherwise), removing portions of a product not intended for the consumer (roots, ends, leaves), or any handling of a product in a manner which does not substantially change the product from its original condition." The Bulletin provides that

"[s]ituations where the definitions of 'field' or 'first point of processing or packing' are unclear should be resolved in favor of the driver."

"Although ultimate responsibility for statutory interpretation rests with the courts, an agency's interpretation 'is "one among several tools available to the court" when judging the [statute's] meaning and legal effect.' [Citations.] An agency's interpretation is entitled to deference if it is long standing, consistent, and contemporaneous." (*Kaanaana v. Barrett Business Services, Inc.* (2021) 11 Cal.5th 158, 178; accord, *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7–8 (*Yamaha*).) We may adopt the agency interpretation as our own if we are persuaded it is correct. (*Alvarado v. Dart Container Corp. of California* (2018) 4 Cal.5th 542, 558 (*Alvarado*).)

Neither party argues the CHP adopted the Bulletin pursuant to a delegation of legislative power and that it constitutes a quasi-legislative regulation.[12] (See *Yamaha*, *supra*, 19 Cal.4th at p. 12 ["quasi-legislative standard of review 'is *inapplicable* when the agency is not exercising a discretionary rule-making power, but merely *construing* a controlling statute' "].) The Bulletin provides interpretive guidance regarding Regulations section 1212(k), and because that regulation restates section 34501.2 verbatim with respect to the definition of "first point of processing or packing," the Bulletin is also the CHP's interpretation of section 34501.2(c)(3)(B). (*Yamaha*, at p. 12.) The weight to be given an agency interpretation of this type is fundamentally situational. (*Ibid*.)

---

[12] Although no analysis was offered in this regard, the trial court's order granting summary judgment seemed to find the Bulletin to be a quasi-legislative rule in light of its finding the Bulletin's interpretation was arbitrary, capricious or without rational basis. (See *Yamaha*, *supra*, 19 Cal.4th at pp. 10–11 [review of quasi-legislative agency rules is limited to whether the rule is arbitrary, capricious, or without reasonable or rational basis].)

The level of deference we accord the CHP's interpretation of the statute "turns on 'whether the agency has a comparative interpretive advantage over the courts, and also whether its interpretation is likely to be correct.' " (*Tower Lane Properties v. City of Los Angeles* (2014) 224 Cal.App.4th 262, 276.) "Factors to consider in determining if an agency has a comparative advantage include whether 'the legal text to be interpreted is technical, obscure, complex, open-ended, or entwined with issues of fact, policy, and discretion.' " (*Ibid.*, quoting *Yamaha*, *supra*, 19 Cal.4th at p. 12.) " 'The weight of such a judgment in a particular case,' … 'will depend upon *the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.*' " (*Yamaha*, at pp. 14–15.)

Although the CHP has accumulated a body of experience and informed judgment in administering the Vehicle Code, we discern no comparative interpretive advantage the CHP holds in the context of this case. The appropriate interpretation of section 34501.2(c)(3)(B) does not involve a technical issue, but rather presents matters of legal interpretation in which courts are well versed and for which they are finally responsible. While the CHP's interpretation, as stated in the Bulletin, is longstanding and nearly contemporaneous with the amendment's enactment, there is no indication it was subjected to public notice and comment procedures. The CHP has not offered any information about where or to whom the Bulletin is available, how it was formulated and adopted, whether senior officials were involved in reviewing and issuing it, or how consistently this interpretation has been adhered to and enforced over the last 28 years.

Thus, while we consider the CHP's interpretation of the first point of processing in section 34501.2(c)(3)(B), we do not extend its interpretation any particular deference, and instead exercise our independent judgment on how the statute is to be construed and

21

applied.  (*State Building & Construction Trades Council of California v. Duncan* (2008) 162 Cal.App.4th 289, 304.)

### 3.      Grammatical Construction

In discerning the most reasonable interpretation of section 34501.2(c)(3)(B), we apply the last antecedent rule, which provides that " ' "qualifying words, phrases and clauses are to be applied to the words or phrases immediately preceding and are not to be construed as extending to or including others more remote." ' " (*Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 743, quoting *White v. County of Sacramento* (1982) 31 Cal.3d 676, 680 (*White*).)   Under that interpretive rule, the term "for distribution in wholesale or retail markets" modifies only the phrase "otherwise manufactured, processed, or preserved."

The statute's punctuation provides further support for this interpretation, as the qualifying phrase "for distribution in wholesale or retail markets" is not set off from the preceding terms by a comma.  (*White*, *supra*, 31 Cal.3d at p. 680 [evidence that a qualifying phrase applies to all antecedents rather than only the immediately preceding one "may be found in the fact that it is separated from the antecedents by a comma"].) Instead, the entire phrase "otherwise manufactured, processed, or preserved for distribution in wholesale or retail markets" is set off using the word "or" which indicates "an intention to use it disjunctively so as to designate alternative or separate categories." (*Ibid.*)

There are two exceptions to the last antecedent rule, neither of which is applicable here.  The first exception "provides that when several words are followed by a clause that applies as much to the first and other words as to the last, ' " 'the natural construction of the language demands that the clause be read as applicable to all.' " ' " (*Renee J.*, *supra*, 26 Cal.4th at p. 743.)  The phrase "for distribution in wholesale or retail markets" does not necessarily apply equally to all the preceding terms because, as demonstrated with the

22

silage at issue here, the farm products could go through any of the specifically enumerated processes without being marketed.

The second exception "provides that '[w]here the sense of the entire act requires that a qualifying word or phrase apply to several preceding wo[r]ds …, [its application] will not be restricted….' [Citations.] This is, of course, but another way of stating the fundamental rule that a court is to construe a statute ' "so as to effectuate the purpose of the law." ' " (*White*, *supra*, 31 Cal.3d at p. 681.) As we have explained, there is nothing in the legislative intent requiring the phrase "dried, canned, extracted, fermented, distilled, frozen, ginned, eviscerated, pasteurized, packed, packaged, bottled, conditioned" to be qualified by the phrase "for distribution in wholesale or retail markets."

Based on these interpretative tools, the most reasonable construction of the statute is to apply the "for distribution in wholesale or retail markets" phrase only to those manufacturing, processing, or preserving activities not included in the first series of processing and packing activities, namely, drying, canning, extracting, fermenting, distilling, freezing, ginning, eviscerating, pasteurizing, packing, packaging, bottling, and conditioning. (§ 34501.2(c)(3)(B.) Since fermentation is included in this list, the exception applies to plaintiffs' drivers even though the silage at issue here was not fermented for distribution in wholesale or retail markets.

We note that "[t]he rules of grammar and canons of construction are but tools, 'guides to help courts determine likely legislative intent. [Citations.] And that intent is critical. Those who write statutes seek to solve human problems. Fidelity to their aims requires us to approach an interpretive problem not as if it were a purely logical game, like a Rubik's Cube, but as an effort to divine the human intent that underlies the statute.' " (*Burris v. Superior Court* (2005) 34 Cal.4th 1012, 1017.)

The human problem to be solved by the hours-of-service exception is to allow harvested farm products to be transported to the first point of processing during the short harvest season before they can spoil in the fields. Interpreting the phrase "for distribution in wholesale or retail markets" to modify only the phrase "or otherwise manufactured, processed, or preserved" is consistent with the reason the Legislature included the provision—to prevent spoilage of farm products during the harvest season—which applies equally to the silage at issue here. Based on this interpretation of section 34501.2(c)(3)(B), plaintiffs' harvesting activities do not fall outside the exception merely because the cornstalks are not fermented for distribution in wholesale or retail markets.

## C.    *The First Point of Processing*

The CHP also contends the hours-of-service exception does not apply to plaintiffs' harvesting activities because the mulching and chopping of the cornstalks as they are harvested constitutes the first point of processing within the meaning of section 34501.2(c)(3)(B). The trial court found the field was not the first point of processing because the statute does not list cutting or harvesting as a form of processing. The CHP asserts it is irrelevant that those terms do not specifically appear in the statute because it contains similar terms, such as extracted, packed, or conditioned, and more generally applies where the farm products are "otherwise manufactured, processed, or preserved." (§ 34501.2(c)(3)(B).) The CHP points out the Bulletin specifies the farm products must be "in virtually the same condition as when [] they were picked, cut, or uprooted in the field" for the exception to apply, and urges us to defer to its interpretation of the statute.

We conclude the field is not the first point of processing since cutting the cornstalks is part and parcel of the harvesting process. Rather, the first point of processing is the dairies, where the fermenting process occurs. (§ 34501.2(c)(3)(B) [first point of processing includes "a location where farm products are … fermented"].) First, the statute does not list cutting or harvesting as a form of processing. (§ 34501.2(c)(1) &

24

(3)(B).)  Moreover, since the specialized harvest equipment the plaintiffs use cuts the cornstalks while harvesting them, the cornstalks are "in virtually the same condition" as when they were "picked, cut, or uprooted" in the field, which is consistent with the Bulletin.  Finally, since the CHP recognizes in its Bulletin that "[s]ituations where the definitions of 'field' or 'first point of processing or packing' are unclear should be resolved in favor of the driver," we resolve this issue in the favor of plaintiffs' drivers.

In sum, the section 34501.2(c) exception for the transportation of farm products was included to address concerns that crops needed to be transported for processing during the relatively short harvest seasons before they could spoil in the fields. This concern applies equally to the cornstalks at issue here, which fall within the parameters of the agricultural hours-of-service exception of section 34501.2(c).  Therefore, the trial court did not err in granting summary judgment in plaintiffs' favor.

## DISPOSITION

The judgment is affirmed.  Costs on appeal are awarded to plaintiffs.  (Cal. Rules of Court, rule 8.278(a)(1).)


                                                                    DE SANTOS, J.

I CONCUR:


LEVY, ACTING P. J.

25

MEEHAN, J., Concurring and Dissenting.

## I.     Introduction

I concur with the majority's conclusion that a declaratory relief action is appropriate in this context, and I agree that plaintiffs' harvesting of cornstalks in the field is not an initial point of processing that would disqualify plaintiffs from the farm products transport exceptions under Vehicle Code section 34501.2, subdivision (c) (section 34501.2(c) or § 34510.2(c)).[1]   However, I am unable to join in the majority's interpretation of the definition of "'[f]irst point of processing or packing'" as set out in section 34501.2(c)(3)(B), and for this reason I am compelled to respectfully dissent from the majority's conclusion plaintiffs' cornstalk transport fits within the farm products exception.

Two farm products exceptions to the intrastate hours-of-service limitations under section 34501.2 are applicable "when transporting farm products from the field to the first point of processing or packing."  (§ 34501.2(c)(1).)  The statute defines "'[f]irst point of processing or packing'" as "a location where farm products are dried, canned, extracted, fermented, distilled, frozen, ginned, eviscerated, pasteurized, packed, packaged, bottled, conditioned, or otherwise manufactured, processed, or preserved for distribution in wholesale or retail markets."  (§ 34501.2(c)(3)(B); see Cal. Code Regs., tit. 13, § 1212, subd. (k)(C)(5)(B).)

The majority holds the most reasonable construction of this statutory definition is to extend the qualifying phrase "for distribution in wholesale or retail markets" only to the immediately preceding "manufactured, processed, or preserved" (§ 34501.2(c)(3)(B)) grouping and *not* to the specific methods included in the first series of processing and packing activities—i.e., drying, canning, extracting, fermenting, distilling, freezing,

---

[1]     All further statutory references are to the Vehicle Code unless otherwise indicated.

ginning, eviscerating, pasteurizing, packing, packaging, bottling, and conditioning. Thus, the market-distribution qualifying phrase does not apply to any of the specific forms of processing articulated, including fermenting. Here, the harvested cornstalks plaintiffs transport from the field to the dairy for fermentation processing are not ultimately distributed in wholesale or retail markets. Under the majority's interpretation, because the market-distribution qualifier does not apply to "fermented" products, the cornstalk fermentation at the dairies fits within the definition of first point of processing or packing.

This is not an unreasonable interpretation. Under the last antecedent rule, the qualifying phrase "for distribution in wholesale or retail markets" could plausibly be interpreted to modify only the final disjunctive phrase "or otherwise manufactured, processed, or preserved" (§ 34501.2(c)(3)(B)). And, as applied here, this interpretation does not work any injustice. The legislative history the majority discusses indicates the farm products transport exceptions under section 34501.2(c) were aimed at preventing field-to-processing transport delays during harvest that might result in product spoilage or quality reduction, and these same concerns apply to the cornstalks being transported for processing in this case. So, from an equitable vantage point, there is reason to expect plaintiffs' activities would fall inside the intended scope of the exceptions. Especially as to the result it creates here, I am reluctant to depart from the majority's interpretation.

This reticence yields, however, to greater concerns that settling on this interpretation as the most reasonable one obligates us to ignore words in the definition, to give short shrift to the market-distribution qualifying phrase, and to sidestep explaining how such an interpretation actually operates outside its application to this case or accords with the express intent of the entire statute. These interpretive shortcomings give rise to trepidation the majority's approach, while a reasonable one resulting in no injustice here,

2.

still fails to achieve the Legislature's purposes. For the reasons explained below, I respectfully dissent.

## II.    Construing the Ambiguity in Section 34501.2(c)(3)(B)

The issue presented is one of statutory construction. "As in any case involving statutory interpretation, our fundamental task here is to determine the Legislature's intent so as to effectuate the law's purpose." (*People v. Murphy* (2001) 25 Cal.4th 136, 142.) "We begin as always with the statute's actual words, the 'most reliable indicator' of legislative intent, 'assigning them their usual and ordinary meanings, and construing them in context. If the words themselves are not ambiguous, we presume the Legislature meant what it said, and the statute's plain meaning governs.'" (*Even Zohar Construction & Remodeling, Inc. v. Bellaire Townhouses, LLC* (2015) 61 Cal.4th 830, 837–838.)

"When the statutory language is ambiguous, a court may consider the consequences of each possible construction and will reasonably infer that the enacting legislative body intended an interpretation producing practical and workable results rather than one producing mischief or absurdity." (*Gattuso v. Harte-Hanks Shoppers, Inc.* (2007) 42 Cal.4th 554, 567 (*Gattuso*).) The overriding purpose in construing a statute is to give it a reasonable construction conforming to the Legislature's intent. (*Ibid.*) To do so, courts are to apply common sense to the language at hand and interpret the statute to make it "'workable and reasonable.'" (*Ibid.*)

To reiterate, the "'[f]irst point of processing or packing'" is defined as "a location where farm products are dried, canned, extracted, fermented, distilled, frozen, ginned, eviscerated, pasteurized, packed, packaged, bottled, conditioned, or otherwise manufactured, processed, or preserved for distribution in the wholesale or retail markets." (§ 34501.2(c)(3)(B).) As the majority indicates, how the market-distribution qualifying phrase should apply is susceptible to differing reasonable interpretations. Only one interpretation, however, gives effect to all the words in the definition and presents a

workable and understandable construction that accords with the Legislature's broader and express purposes in amending section 34501.2.

> ### A. Extending Market-distribution Qualifier to All Forms of Processing Best Adheres to the Plain Language and is the Most Workable Construction

Beginning with the words used in the statutory definition, the most natural reading of the language is that the market-distribution qualifying phrase modifies all forms of processing or packing identified in the definition. In articulating various methods of processing or packing, section 34501.2(c)(3)(B) transitions from specific processing methods to a broad descriptive category using the term "otherwise." In context, the disjunctive phrase "or otherwise manufactured, processed, or preserved" signals a catchall for any *other* processing or packing method not adequately captured by the immediately preceding list of more specific descriptors. This plain and commonsense reading gives appropriate effect to the word "otherwise," and allows the broader catchall to encompass amalgamations of the listed descriptors that do not neatly or perfectly fall into any of the specifically listed types. (*Presbyterian Camp & Conference Centers, Inc. v. Superior Court* (2021) 12 Cal.5th 493, 509 [although not a rule to be applied mechanically, as much as possible in statutory construction, every word in statute should add meaning, and no language should serve as mere surplusage].)

This interpretation makes good, practical sense. The specific list of descriptors provides helpful exemplars of the types of processing activities the Legislature intended would fit into this definition, while the catchall use of "or otherwise manufactured, processed, or preserved" (§ 34501.2(c)(3)(B)) makes the specific methods nonexhaustive and solves any exclusivity or overlap dilemma posed by the specifically listed methods. Consider, for example, an initial point of processing for timber. This might generally be referred to as milling, but could hypothetically include a more specific combination of drying, cutting, sawing and sealing designed to preserve the timber and process it to a

useable form. Milling is not among the specific processing forms listed, but drying is and sealing is almost certainly the same thing as being "conditioned" (§ 34501.2(c)(3)(B)). Interpreting the phrase "or otherwise manufactured, processed, or preserved" (*ibid.*) as a catchall provision avoids a practical interpretive dilemma as "manufactured, processed, or preserved" (*ibid.*) is not necessarily neatly separable from the series of specific processing forms. Accordingly, the catchall construction supplies flexible functionality to the definition.

The need for this definition to be understandable, workable and agile enough for real-world application is also why a recognized exception to the last antecedent rule so thoroughly fits this situation and should be applied here. As a general tenant of statutory construction, the last antecedent rule provides that modifying phrases are to be applied to the words immediately preceding them and are not to be construed as extending to more remote phrases. (*White v. County of Sacramento* (1982) 31 Cal.3d 676, 680.) Under that interpretive principle, the catchall phrase is the only set of processes modified by the market-distribution qualifier.

But, "like all such interpretive rules, the last antecedent rule has its exceptions, such as when the qualifying language applies just as naturally to the earlier items in a list as the later items." (*Wilde v. City of Dunsmuir* (2020) 9 Cal.5th 1105, 1127.) Under this exception, the market-distribution qualifier applies to the catchall phrase and every form of specific processing listed before it. The majority rejects this exception by concluding the market-distribution requirement does not apply equally to all forms of processing listed in the definition because, like the cornstalks here, farm products could go through any of the enumerated processes without being marketed. But that misses the point: all farm products are commodities that, despite what form of processing might apply, are equally *amenable* to market distribution. Just because the cornstalk silage here is not distributed in the market does not indicate the market-distribution qualifier is somehow

5.

less applicable to "fermented" products than those "otherwise manufactured, processed, or preserved" (§ 34501.2(c)(3)(B)).

Beyond the fact the exception is a technical fit for all the antecedents in the list, failure to apply it here causes a basic operability problem. If the market-distribution qualifier is extended only to products "otherwise manufactured, processed, or preserved" (§ 34501.2(c)(3)(B)), it creates a bizarre dichotomy with the specifically listed forms of processing. As noted, processes that may better fit within the catchall phrase are not necessarily cleanly distinct from the specific methods listed. From a functional perspective, without extending the market-distribution qualifier to all the processing methods in the definition, it is impossible to understand how the market-distribution requirement will actually work if a catchall processing method nevertheless encompasses some specific method(s).

Referring again to the timber example, if milling timber at the first point of processing includes sawing and conditioning, for example, it is unclear if the milling process would come within the ambit of the specific processing types (because the timber is being "conditioned" (§ 34501.2(c)(3)(B)) or fall into the more general category (because the timber is being sawed as part of the overall milling process, which are both processes not specifically listed), and, hence, whether a market-distribution requirement would attach. The majority does not explain the general operational effect of its interpretation. While it is certainly understandable how the majority's interpretation applies to plaintiffs' processing method here, it is very unclear how the market-distribution requirement would function in other processing scenarios when applied only to the catchall phrase. (*Gattuso, supra,* 42 Cal.4th at p. 567 [statutes should be interpreted in a manner that is workable and reasonable].) Moreover, I can glean no legislative purpose that would be served by attaching a market-distribution requirement to some but not all of the processing methods. This brings me to consider the legislative

6.

purpose served by injecting the market-distribution requirement into the definition at all, and that does offer clarity.

**B.      Extending Market-distribution Qualifier to All Forms of Processing Best Serves Legislative Aims**

I agree with the majority's conclusion the legislative history provides no meaningful insight into how broadly the Legislature meant to extend section 34501.2(c)(3)(B)'s market-distribution qualifier under the farm product transport exceptions. However, these transport exceptions were carved out in 1992 when the Legislature amended section 34501.2 to impose hours-of-service limitations on commercial vehicles engaged in intrastate commerce. Stepping back from a more myopic focus on the exceptions, there is relevant legislative history and an express statement of the Legislature's purpose in electing to limit the hours of service in the first place. Determining legislative intent as to the scope of the farm products transport exceptions must be measured and evaluated against the larger legislative purposes and history behind the actual limitations from which they were excepted. (See *City of San Jose v. Superior Court* (2017) 2 Cal.5th 608, 617 [courts consider portions of a statute in the context of the entire statute and the statutory scheme of which it is a part in pursuance of legislative purpose].)

The 1992 amendments to section 34501.2 were expressly intended by the Legislature to (1) address the problem of commercial truck accidents in California caused by driver fatigue due to excessive hours of service; and (2) regulate the hours-of-service of drivers of commercial vehicles engaged in intrastate commerce in a manner equivalent to federal regulations applicable to interstate commerce. (Stats. 1992, ch. 1144, § 1(a)–(b), pp. 5308–5309.)

The Legislature was aware that major differences between intrastate exceptions and federal regulations might risk the loss of federal funding. (Stats. 1992, ch. 1144,

§ 1(a)(2), p. 5308; Assem. Com. on Transportation, Analysis of Assem. Bill No. 2417 (1991–1992 Reg. Sess.) as amended Apr. 21, 1992, p. 2 [noting that "[a]ccording to [the California Highway Patrol], California risks the loss of $2.5 million in federal Motor Carrier Safety Assistance Program (MCSAP) program funds as long as there are major differences between federal and state regulations relating to hours of service"].) The Legislature also expressly stated its intent to align intrastate driver hours with federal hours-of-service limits "with a minimum of exceptions" for safety purposes. (Stats. 1992, ch. 1144, § 1(b), pp. 5308–5309.)

Yet, the farm products transport exceptions were somewhat expansively drawn: farm products were defined comprehensively to include "every agricultural, horticultural, viticultural, or vegetable product of the soil, honey and beeswax, oilseeds, poultry, livestock, milk, or timber" (§ 35401.2(c)(3)(A)); and the additional exception for transport of "special situation farm products" even includes "transporting livestock from pasture to pasture" (§ 34501.2(c)(1)).

In view of the Legislature's stated objectives and the somewhat broad exceptions for farm products transport, a market-distribution requirement embedded in the farm products transport exceptions serves twin aims. Adding the market-distribution requirement keeps the exception from being open-ended, and this comports with the Legislature's desire to limit exceptions both for purposes of safety and funding. At the same time, the great bulk of first point of processing or packing of farm products in California is likely for distribution in wholesale or retail markets. Thus, the market-distribution requirement maintained the exceptions' broad reach but prevented them from being totally unbounded.

Since there are legislative purposes served by a market-distribution requirement under the farm transport exceptions, and no purpose served or rational reason why that requirement would apply only to the catchall forms of processing listed in

8.

section 34501.2(c)(3)(B), extending the market-distribution qualifier to all forms of processing in the "'[f]irst point of processing or packing'" definition most clearly reflects legislative intent with respect to the whole statutory scheme.

### C.    Agency Guidance

The California Highway Patrol bulletin interprets the market-distribution qualifier as extending to all forms of processing listed in section 34501.2(c)(3)(B)'s definition. For all the reasons the majority has already explained, I agree the California Highway Patrol bulletin is not entitled to any great or dispositive weight in the interpretive calculus, but that does not mean it is of zero consequence. While this guidance in no way compels my construction of the "'[f]irst point of processing or packing'" (§ 34501.2(c)(3)(B)) definition, it is consistent with the interpretation I find most reasonable and lends some additional weight to that conclusion. (See generally *Alvarado v. Dart Container Corp. of California* (2018) 4 Cal.5th 542, 559 [court exercising independent judgment "should certainly" take agency's interpretation into consideration].)

### D.    Conclusion

In sum, interpreting section 34501.2(c)(3)(B) to extend a market-distribution requirement to all forms of processing articulated in the "'[f]irst point of processing or packing'" definition is the most reasonable and workable construction of the statute. Not only does this reflect the most natural reading of the language that gives effect to all the words used, it is also the construction that offers the most practical clarity in real-world application and comports best with the Legislature's express aims for imposing intrastate hours-of-service limitations with minimal exceptions. In view of this interpretation, I unfortunately cannot agree plaintiffs' transport activities fit within section 34501.2(c)'s exceptions or that they were entitled to summary judgment. Bound to the interpretation I

9.

believe best reflects the intent of the Legislature and the principles of statutory construction, I would reverse and remand.

## III.   Final Observations

Neither of the interpretive options entertained here is particularly appealing. One interpretation excludes specialized harvesters from farm transport exceptions that seems built for the very type of driver-resource, cost and product-quality challenges these harvesters face. The other interpretation, while reasonable and providing an equitable outcome in this case, charts a course without much fidelity to the statute's language or the larger legislative aims and produces a construction even more ambiguous and less practically workable than at the outset.

Given these alternatives, perhaps the farm transport exceptions deserve fresh legislative consideration. It may be the Legislature did not anticipate how the exceptions might be relevant to the transport of farm products *not* destined for market distribution. After all, if farm products are not intended for market distribution, it may have been difficult to envision why a harvester would have so much product to bring in from the field that driver hours-of-service exceptions would be applicable. This may also be a reflection of the age of the exceptions in concert with advancement and specialization of agricultural practices in the 30 years since the exceptions were enacted. In any event, section 34501.2(c)(3)(B) may be ripe for a clarifying update.

MEEHAN, J.

10.